UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CLINE COCKBURN | CIVIL ACTION NO. 22-cv-02058 |
| VERSUS | SECTION M (4) |
| APEX OIL COMPANY, INC, M/V SAN ROBERTO and BUFFALO MARINE SERVICE, INC. | JUDGE BARRY W. ASHE |
| | MAGISTRATE KAREN WELLS ROBY |

**MEMORANDUM IN SUPPORT OF BUFFALO MARINE AND APEX'S JOINT MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DR. ALEXIS WAGUESPACK**

Defendants, Buffalo Marine Service, Inc. ("Buffalo Marine") and Apex Oil Company, Inc. ("Apex"), respectfully submit their Memorandum in support of Motion *in Limine* to Exclude the Testimony of Dr. Alexis Waguespack, the purported expert witness of Cline Cockburn ("Cockburn").[1] To the extent she may offer expert opinions on medical causation or necessity of treatment or testify in any way as an expert, Dr. Waguespack does not possess the requisite expertise, and her opinions are not reliable nor based on sufficient facts or data as is required under Federal Rule of Evidence 702. Buffalo Marine and Apex, therefore, move to exclude Dr. Waguespack's opinions, including any records purporting to show medical causation and future treatment and corresponding potential testimony, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[1] Buffalo Marine and Apex have coextensively moved *in limine* to exclude expert opinions of Dr. Waguespack based on Cockburn's failure to provide expert disclosures regarding Dr. Waguespack under Federal Rule of Civil Procedure 26(a)(2)(C). Buffalo Marine and Apex adopt and incorporate by reference that argument. Should that motion *in limine* be denied, Dr. Waguespack's testimony should nevertheless be excluded, as set out *supra*.

## I. <u>Background</u>

Cockburn alleges that he was injured on July 5, 2021, when a gangway fell as he disembarked a Buffalo Marine tow at the Mt. Airy facility owned by Apex. He claims to have taken one or two steps onto the gangway, when it slid and dropped to the dock. Cockburn told the dockman, who witnessed the accident, that he was not injured. Shortly after the incident, he complained of back, knee, neck, and hip pain, but was released to full duty on July 30, 2021.

Throughout 2021 and 2022, medical records show that not only did Cockburn's neck and back pain improve, but also that several events occurred such as strenuous physical activity and falls that caused new pain. Cockburn had a history of pre-existing knee pain and surgery and complaints of neck and back pain. He did not seek treatment for cervical pain from Dr. Waguespack until April of 2022, nearly nine months after the incident and upon referral of his attorneys. Without the benefit of additional testing to substantiate the need for surgery or conservative treatment like injections, Dr. Waguespack set a course for multiple operations that were neither necessary nor indicated from Cockburn's symptoms. First, Dr. Waguespack performed a discectomy and fusion at three cervical levels on Cockburn in October 2023. Then, she performed a second discectomy and fusion at four levels in October 2024. This additional fusion was allegedly based on signs of pseudoarthrosis, which was neither related to the incident nor truly indicated. Finally, Dr. Waguespack has recommended yet another cervical surgery but only based on a 40-60% potential need.

Although she had insufficient information both factually and medically, Dr. Waguespack has nevertheless opined in her depositions that Cockburn's cervical symptoms were causally related to the July 2021 incident. She also improperly casually linked Cockburn's two past cervical surgeries and potential third to the incident.

As for Mr. Cockburn's alleged lumbar injuries, Dr. Waguespack testified during her first deposition that Mr. Cockburn's lumbar conditions were not caused by the accident and that no future lumbar procedures were recommended. During her second deposition, however, she testified that he "may need" future lumbar treatment, but that she did not have sufficient information to determine whether his conditions were caused by the accident, as she had "not really worked up his lumbar spine."[2] Regardless of which of these changing positions is to be believed, it is clear that Dr. Waguespack's testimony regarding Mr. Cockburn's lumbar spine is inadmissible.

## II. <u>Law and Argument</u>

As shown below, Dr. Waguespack does not possess the requisite expertise, and her opinions do not satisfy *Daubert*'s requirement of reliability and based on sufficient facts or data. *Daubert*, 509 U.S. at 589. Any one of these factors warrant exclusion of Dr. Waguespack's opinions.

### A. <u>Federal Rule of Evidence 702 and *Daubert* Requirements</u>

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The rule permits an expert to offer opinions if (a) his specialized knowledge will help the trier of fact, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied those principles and methods. Fed. R. Evid. 702. The Supreme Court's decision in *Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). The proponent of the expert bears the burden of establishing these criteria. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc)*.

[2] Deposition of Dr. Waguespack, 6/9/25, at p. 73, 75, pertinent pages of which are attached as Exhibit 1.

The reliability analysis of *Daubert* and Rule 702 "applies to all aspects of an expert's testimony" – not only to the methodology, but also to "the facts underlying the expert's opinion" and "the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Seaman v. Seacor Marine L.L.C.*, 326 Fed. Appx. 721, 725 (5th Cir. 2009) (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009)).

**B. Dr. Waguespack Lacks Expertise.**

An expert providing opinion testimony must be "qualified by 'knowledge, skill, experience, training or education.'" *Aircraft Holding Solutions, L.L.C. v. Learjet, Inc.*, No. 23-10388, 2024 WL 3042394, *10 (5th Cir. June 18, 2024); *see also* Fed. R. Evid. 702. The testimony of an expert witness should be excluded if the court finds that the witness is "not qualified to testify in a particular field or on a given subject." *Carlson v. Bioremedi Therapeutic Systems, Inc.*, 822 F.3d 194, 199 (5th Cir. 2016). Whether an individual is qualified to testify as an expert is a question of law. *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018).

According to the American Board of Orthopaedic Surgery, Dr. Waguespack was initially board certified in Orthopaedic Surgery from July 2000 to December 2020, but her board certification lapsed between January 1, 2021 and July 15, 2023.[3] Notably, this lapse in certification took place during part of Cockburn's treatment, which began in April 2022 and preceded his first cervical surgery.

Board certification is a critical part of expertise. This Court has noted that "maintaining one's board certification is rigorous and involves verification of credentials, completion of a self-

[3] *See* Exhibit 2.

evaluation, and a completion of a secure examination." *In re Vioxx Products*, 489 F. Supp.2d. 587, 594 (E.D. La. 2007). As the Court recognized,

> Certification is designed to assure the public that a medical specialist has successfully completed an approved educational program and an evaluation, including a secure examination designed to assess the knowledge, experience, and skills requisite to the provision of high quality patient care.

*Id.* (quoting American Board of Internal Medicine-About Certification, *http://www.abim.org/cert/index.shtm* (last visited May 21, 2007)). Likewise, the American Board of Orthropaedic Surgery states:

> Board Certification is a valuable way that physicians can demonstrate their commitment to the highest quality care. Board Certification sets the physician apart as a recognized specialist in the eyes of patients, hospitals, employers, and insurers.
>
> Board Certification is a voluntary process. It is different and distinct from licensure to practice medicine, a function regulated by state government. A valid medical license is required to be Board Certified, but certification is not necessary for licensure. A Board Certified physician has met certain standards and passed tests that are developed to assure the public that he or she has been adequately trained in a given specialty.

Abos.org/certification (last visited June 12, 2025).

In her first deposition, Dr. Waguespack testified that she was board certified, without mentioning the lapse:

> Q. Do you have …board certifications?
>
> A. (Nods head)
>
> Q. In which areas?
>
> A. Orthopedic.
>
> Q. Okay. Have any of your certifications or licenses ever been suspended or revoked—

A. No.[4]

At her most recent deposition in June 2025, however, Dr. Waguespack, after first denying the lapse, then admitted it but blamed COVID.[5] This lapse, in addition to Dr. Waguespack's propensity for lack of candor, calls into question her qualifications as an expert witness. *See In re Vioxx*, 489 F. Supp.2d at 595.

Finally, Dr. Waguespack admitted being the subject of review before "a lot of" Medical Review Panels based on patient complaints.[6] While Dr. Waguespack denied having malpractice suits filed against her,[7] there have been multiple. *See Frederick v. St. Charles Surgical Hospital, LLC, et al*, No. 807-807, 24th Judicial District Court, Jefferson Parish (2017); *Bordelon v. Waguespack*, No. 695183, 24th Judicial District Court, Jefferson Parish (2010); *Delatte v. Waguespack*, No. 10-10901, Civil District Court, Orleans Parish (2011); *Boudreaux v. Waguespack*, No. 579600, 24th Judicial District Court, Jefferson Parish (2002). She also denied having been the subject of a negligent credentialling suit, which was also incorrect.[8] *See Richoux v. West Jefferson Holdings, LLC, et al*, No. 2020-2139, Civil District Court, Orleans Parish. Again, in addition to Dr. Waguespack's lack of candor, her expertise is strongly in question given that her standard of care has been brought into question so often.

---

[4] Deposition of Dr. Waguespack, 7/15/24, at p. 24, pertinent pages of which are attached as Exhibit 3.
[5] Deposition of Dr. Waguespack, 6/9/25, at pp. 10-13.
[6] *Id.* at p. 16.
[7] *Id.* at pp. 15-16.
[8] *Id.* at p. 69.

### C. Dr. Waguespack's Opinions Are Not Reliable.

To be admissible, expert testimony must be "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589)). Courts apply a five-factor test for gauging the reliability of an expert's methodology:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore*, 151 F.3d at 275 (citing *Daubert*, 509 U.S. at 593-95).

#### 1. Dr. Waguespack's Opinion Regarding Causation Is Not Reliable.

Dr. Waguespack's opinion that Cockburn's cervical symptoms and two cervical surgeries were more probable than not caused by the July 2021 incident is unreliable.[9] Her conclusion was entirely based on Cockburn self-reporting cervical pain allegedly arising out of the incident. Notably, this self-reporting came during his first treatment for cervical symptoms nearly nine months after the incident and after being referred by his attorney.[10] Cockburn's own accuracy in self-reporting is severely in question as he lied several times to Dr. Waguespack: Cockburn denied ever smoking although he smoked for 36 years;[11] Cockburn denied having previous physical therapy for neck and back pain despite treating in physical therapy for those reasons;[12] and Cockburn denied having back pain before the incident although he was treated at an emergency room for back pain after a car accident in 2020.[13] Dr. Waguespack was not aware of Cockburn's

[9] Deposition of Dr. Waguespack, 7/15/24, at p. 84.
[10] *Id*. at pp. 48, 83-84.
[11] *Id.* at pp. 37-39.
[12] *Id*. at pp. 40-41.
[13] *Id*. at pp. 45-46.

falsehoods , nor was she provided the records to contradict what Cockburn self-reported. Dr. Waguespack simply made an assumption as to causation, the source of which is suspect. That assumption should be excluded. *Schindler v. Dravo Basic Materials Co., Inc.*, 790 Fed. Appx. 621 (5th Cir. 2019) (affirming exclusion of expert testimony based on a "significant assumption" as unreliable).

Dr. Waguespack's opinion as to causation is also unreliable under her own methodology. She testified that she relied upon x-rays as objective evidence of Cockburn's cervical symptoms; however, a cervical and lumbar x-ray taken at Dr. Waguespack's first visit in April 2022 showed spondylosis.[14] Dr. Waguespack herself admitted that spondylosis is an arthritic change that is an age-related degradation.[15] Most importantly, Dr. Waguespack testified that the "spondylosis isn't caused by the accident."[16] During Cockburn's first cervical fusion and discectomy, Dr. Waguespack noted "significant" spondylosis[17] Thus, by Dr. Waguespack's own testimony, a significant part of the surgery was to address an age-related condition that was not caused by the July 2021 incident.

Among the conditions imposed by the Federal Rules of Evidence on the admissibility of expert opinion testimony is that the testimony be 'based on sufficient facts or data.'" *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (citing Fed. R. Evid. 702(b)). "In particular, an opinion, based on 'insufficient, erroneous information,' fails the reliability standard. *Id.* (citing *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir.2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence)). In the

[14] *Id.* at p. 60.
[15] *Id.*
[16] *Id.*
[17] *Id.* at pp. 71-74.

*Daubert* reliability analysis, "the existence of sufficient facts . . . is in all instances mandatory." *Id*.

Dr. Waguespack's opinion is based on insufficient facts and data and thus fails to meet the reliability standard. Not only was she not aware of Cockburn's previous complaints of and treatment for back pain, but she also was unaware of his falling at a grocery store in 2021 and his laying concrete for five hours and being sore,[18] both prior to the July 2021 incident. Dr. Waguespack also did not know that Cockburn had neck and lower back pain secondary to repairing his garage,[19] Cockburn suffered neck pain after moving heavy pieces of equipment,[20] and Cockburn had lower back pain after falling,[21] all of these occurring after the July 2021 incident but before his first visit with Dr. Waguespack. Dr. Waguespack did not consider any of these factors as causative (or even aggravating), nor did she consider Cockburn's age, weight, and history of occupational manual labor.

Dr. Waguespack's opinion as to causation for the second surgery is similarly unreliable. In July of 2024, Dr. Waguespack testified that Cockburn's myelopathy, a spinal cord problem Dr. Waguespack had diagnosed and used as the basis for the first surgery, was resolved at least 90%.[22] Yet, Cockburn underwent a second cervical surgery in October of 2024. The key difference is that this surgery was to address pseudoarthrosis, a condition in which the bones do not fuse or as Dr. Waguespack testified, when there is "a delayed union."[23] Importantly, Dr. Waguespack was unable to identify a specific cause:

> Q. And what's the cause of [pseudoarthrosis] generally?

---

[18] *Id*. at pp. 46-48.
[19] *Id*. at p. 52-53.
[20] *Id*. at pp. 53-54.
[21] *Id*. at 54.
[22] *Id*. at 75-76.
[23] Deposition of Dr. Waguespack, 6/9/25, at p. 23.

> A. Well, there's, like, multiple causes. You can blame whatever. Sometimes it's just the fact that you have the multiple levels. There's already an increased incidence as the number of levels go up. Biology. If someone is a smoker, increases your chances of pseudoarthrosis.
>
> * * *
>
> Poor circulation.[24]

Thus, Dr. Waguespack cannot possibly opine that it is more likely than not that Cockburn's second cervical surgery was caused by the July 2021 incident. Nor could she opine that the subsequent infection of the post-operative wound, which was treated by an infectious disease doctor (not her specialty), and irrigation procedure, which she performed to address the wound, are causally related to the July 2021 incident because they arose out of this second, unrelated surgery.

While Cockburn may argue that he is now pain free after the cervical surgeries, that end does not prove medical causation. It is Cockburn's burden of proof to prove such causation. He cannot meet that burden of proof through Dr. Waguespack. Dr. Waguespack's opinion as to causation is unreliable and must be excluded.

**2. <u>Dr. Waguespack's Opinion Regarding the Necessity of the Cervical Surgeries Is Not Reliable.</u>**

Just as her causative opinion is unreliable, Dr. Waguespack's opinion that more probable than not Cockburn required two cervical surgeries is similarly unreliable.[25] Defendants' expert, Dr. Everett Robert, opined that while Cockburn reported injuries to his neck and back, the objective evidence in an MRI did not explain his symptoms. Dr. Robert would have conducted additional testing, which Dr. Waguespack did not perform. Instead, Dr. Waguespack bypassed such tests and

---

[24] *Id.*
[25] Deposition of Dr. Waguespack, 7/15/24, at pp. 84-85.

more conservative treatment directly to a surgical recommendation. It is far more than a difference of medical opinion. Dr. Waguespack's basis for her opinion that the first surgery was necessary is completely unreliable. She has not established a necessity basis for the second surgery either, which procedure and anything subsequent to it has already been shown to not be causally related in any degree. Finally, as stated *infra*, just because Cockburn may claim that his pain has resolved, that argument does not establish that these surgeries were necessary.

### 3. **Dr. Waguespack's Opinion Regarding a Future Cervical Surgery is Not Reliable.**

Plaintiff's counsel intends to offer evidence, including testimony from Dr. Waguespack, that Cockburn will need additional medical treatment to his cervical spine, including a third surgery (a single-level fusion at C6-7). This testimony should be excluded for two (2) reasons: (i) first, Cockburn did not comply with Fed. R. Civ. P. 26(a)(2)(C) or this Court's scheduling order with respect to these opinions; and (ii) second, Dr. Waguespack's testimony regarding this future treatment and surgery is unreliable.

This Court's October 25, 2023, *Scheduling Order* required Cockburn to make expert disclosures, ***including of treating physicians under Rule 26(a)(2)(C)***, by July 22, 2024.[26] Cockburn did not produce any medical record, report, or Rule 26(a)(2)(C) disclosure by Dr. Waguespack by that date stating that he would need an additional single-level fusion. The only document that mentions any recommendation for this procedure is a life care plan prepared by

[26] R. Doc. 51 at 3.

Plaintiff's retained expert, Jordan Frankel[27] (as well as a supplemental life care plan submitted by Jordan Frankel on May 5, 2025).[28]

At the time of her first deposition on July 14, 2022 (6 days before Mr. Frankel's original report), Dr. Waguespack had already performed an anterior fusion at C3-C7, and the only future treatment she recommended was a posterior fusion at the same 3 levels.[29] This posterior fusion at C3-C7 was performed on October 18, 2024.[30]

At her supplemental deposition on June 9, 2025, Dr. Waguespack first testified that she did not recommend **any** future treatment of Cockburn's cervical spine.[31] Upon follow-up questioning by Apex's counsel to clarify whether she indeed recommended a subsequent, single-level fusion, when presented with Frankel's report, Dr. Waguespack changed course, testifying that she did recommend this additional surgery after all:

> Q. You testified a minute ago that you didn't have any recommended future treatment for Mr. Cockburn. I'll represent to you this is a page from a life care plan prepared by Jordan Frankel, and one of the things that's listed under future interventional and surgical treatment is a further one level ACDF at C6-C7. Do you see that?
>
> A. Right. I do see it.
>
> Q. Okay. So is that incorrect that that procedure has been recommended?
>
> A. Well, that's always a very big potential when you have a three-level fusion, adjacent level disease. We know he's going to get adjacent level disease. So if it does, what's it going to entail? It's going to entail an anterior cervical fusion at C6-7.

---

[27] Life Care Plan by Jordan Frankel, 7/22/24, at pp. 17 and 28, pertinent pages of which are attached as Exhibit 4.
[28] Life Care Plan by Jordan Frankel, 5/5/25, at p. 9 (Cockburn 006299), pertinent pages of which are attached as Exhibit 5.
[29] Deposition of Dr. Waguespack, 7/15/24, at pp. 80-81.
[30] Deposition of Dr. Waguespack, 6/9/25, at p. 38.
[31] *Id*. at p. 62.

> Q. Okay. But your testimony as of today, though, is that that is not something that's recommended at this point in time?
>
> A. More likely than not. I hope it's not me who has to do that, though. It's going to be very hard.
>
> Q. I just want to be clear. So have you recommended that he undergo that procedure or not?
>
> A. Yes, I do recommend that procedure.[32]

She testified that her earlier testimony that he would ***not*** need future treatment was incorrect, but clearly stated that she did not recommend any future treatment for Cockburn ***other than*** this single-level fusion.[33] Plaintiff's counsel then took Dr. Waguespack through Mr. Frankel's report, in which he detailed additional future treatment that he thought was necessary, and Dr. Waguespack changed course again, agreeing with Mr. Frankel and plaintiff's counsel that there was additional future treatment that Cockburn would need.[34] However, Dr. Waguespack testified that no recommendations for this future surgery and treatment were contained within her medical records or any other document prepared by her:

> Q. Okay. All of these recommendations that Mr. Shlosman took you through, I haven't seen records in that other than the letter to Mr. Cockburn's paid expert. Are there any other records of those future surgical recommendations?
>
> A. Which ones?
>
> Q. The ones Mr. Shlosman walked you through in the letter to Mr. Frankel.
>
> A. The additional surgery thing?
>
> Q. Yes.

---

[32] Deposition of Dr. Waguespack, 6/9/25, at pp. 62-63.
[33] *Id.* at p. 63.
[34] *Id.* at pp. 70-74.

A. I don't know that there's any other records.[35]

This alone is a basis for exclusion of any evidence of the need for future cervical treatment. In *Gilmore v. WWL-TV, Inc.*, CIV.A. 01-3606, 2002 WL 31819135, at *1 n. 1 (E.D. La. Dec. 12, 2002) (Engelhardt), as here, there was a scheduling order requiring Rule 26(a)(2)(C) reports of treating physicians by a certain date. As here, the plaintiff produced medical records by that date, and one of the plaintiff's treating physicians later recommended a surgery. *Id.* at *1. As here, the plaintiff did not produce any medical records, reports, or written opinions regarding this future care, by the disclosure deadline or at any time. *Id.* at *2. Judge Engelhardt of this Court excluded evidence of this future treatment on this basis:

> Accordingly, Dr. Finney shall be permitted to testify as to his past care and treatment of the plaintiff without limitation, as well as his current treatment of the plaintiff, if any. In that regard, CBS' motion is DENIED. However, as to any comments or expert opinions of Dr. Finney that were not memorialized in writing and timely exchanged, CBS' Motion in Limine is GRANTED. The Court believes the foregoing rulings permitting the testimony of Dr. Finney to testify regarding his care and treatment, but excluding any expert opinion testimony which was not memorialized in writing and timely exchanged, preserves the purpose and integrity of the pretrial orders issued in this case and comports with the applicable Federal Rules of Civil Procedure. Suffice it to say, Dr. Finney's opinion testimony is strictly limited to his opinions expressed in written medical records that were timely exchanged in accordance with the Court's scheduling order, and written expert reports timely exchanged, if any. Additionally, any testimony by either of the plaintiff's treating physical therapists in the nature of an expert opinion shall be strictly limited to opinions set forth in medical records and/or reports, if any, that were timely exchanged.

*Id.*

The facts here are identical to those in *Gilmore*, and this Court should reach the same conclusion on the same basis.

---

[35] Deposition of Dr. Waguespack, 6/9/25, at pp. 75-76.

Additionally, Dr. Waguespack's opinion regarding the need for future cervical surgery is unreliable. Expert testimony "must be 'based on sufficient facts or data.'" *Robin v. Weeks Marine, Inc.*, CV 17-1539, 2018 WL 10776315, at *1 (E.D. La. Nov. 19, 2018) (Morgan, J.) (citing F. R. Evid. 702.) "In order to be admissible, projected treatment costs must be based on evidence demonstrating the treatment that a plaintiff will probably need, not simply the treatment that he might need." *Id.* (citing *Anders v. Hercules Offshore Servs., LLC*, 311 F.R.D. 161, 165 (E.D. La. 2015) (Africk, J.)).

According to Dr. Waguespack's testimony, her recommendation of future surgery was based solely on the statistical likelihood that he may develop certain conditions in the future:

> Q. Okay. So what is the basis for this single level cervical fusion at C6-7?
>
> A. What's what? What's the basis of the anterior cervical fusion at C6-7?
>
> Q. What is the basis for this recommended single level fusion at C6-7?
>
> A. Yeah. So adjacent level C6-7 anterior cervical fusion secondary to what we call adjacent segment disease from the increased stresses of a three-level fusion on the lower cervical discs.
>
> Does that answer your question?
>
> Q. Okay. Not really. What is your basis for your conclusion that Mr. Cockburn needs that surgery?
>
> A. Well, there is about a 60 percent -- or anywhere between 40 percent to 60 percent chance of adjacent segment disease that will require intervention.
>
> Q. And that's just the case any time that there's been a three-level fusion?
>
> A. Yeah. As the number of levels go up, the probability goes up.
>
> Q. Okay. So the indication for the surgery is that based on the surgeries that have already been performed, there's a 40 to 60

> percent chance that he would need this additional surgery in the future --
>
> A. Yes.
>
> Q. -- is that right?
>
> A. (Nods head affirmatively).[36]

Thus, Dr. Waguespack's opinion that Cockburn will need this surgery is not based on any diagnoses or observations of Cockburn's condition. Instead, it is based upon Dr. Waguespack's opinion that there is a "40 percent to 60 percent chance" that he will develop conditions in the future that would necessitate the surgery. A 40%-60% chance is ***not*** "more probable than not." Indeed, Dr. Waguespack offered conflicting testimony ***within the same deposition*** as to whether any future cervical treatment was indicated. Therefore, this testimony is unreliable and should be excluded.

**4. Dr. Waguespack's Opinion Regarding a Future Lumbar Surgery is Not Reliable.**

During her second deposition, Dr. Waguespack testified that Cockburn "may need future treatment to his lumbar spine."[37] Any testimony or evidence of such treatment should be excluded.

At Dr. Waguespack's first deposition, she testified that no lumbar procedures had been completed or recommended.[38] She had diagnosed Cockburn with spondylosis and facet arthropathy in the lumbar spine, but testified that these conditions were ***not*** caused by the accident:

> Q· · Can you say more probable than not that the spondylosis, cervical and lumbar, were caused by this July 21st incident?
>
> A· · No.· ***The spondylosis isn't caused by the accident.***[39]

* * *

[36] Deposition of Dr. Waguespack, 6/9/25, at pp. 65-66.
[37] Deposition of Dr. Waguespack, 6/9/25, at p. 73.
[38] Deposition of Dr. Waguespack, 7/15/24, at p. 74.
[39] *Id.* at p. 60 (emphasis supplied).

Q· · And this is a follow-up of that lumbar radiculopathy, which we had talked about already; correct?

A· · Correct.

Q· · The inflammation. The X-ray did show exactly where -- yes.· If you look on the last page, Bates Number 23, "Facet Arthropathy."

A· · (Views document.)

Q· · And first tell me -- it says, "Decreased HT and facet arthropathy."

A· · Facet arthropathy?

Q· · Uh-huh.

A· · It's arthritic looking joint.

Q· · Okay.· What is the decreased HT?· What is -- what does the "HT" stand for?

A· · Decreased height is the disc-space height, it looks smaller.

Q· · Got it.

A· · -- on the X-ray.

Q· · Okay.

A· · It looks small to me.

Q· · Now, are you able to say it's more probable than not that this facet arthropathy was due to the July 21st incident?

A· · ***No.· The arthropathy is preexisting***.[40]

At her second deposition, Dr. Waguespack admitted that she did not have sufficient information to form an opinion about Cockburn's lumbar condition or whether it was caused by the accident, as she had "not really worked up his lumbar spine."[41] Thus, Dr. Waguespack cannot properly offer any opinions regarding Cockburn's lumbar condition or the need for future lumbar

[40] Deposition of Dr. Waguespack, 7/15/24, at pp. 70-71 (emphasis supplied).
[41] *Id.* at p. 75.

procedures at trial, as any such opinion would be based on "insufficient" information and therefore not reliable under *Daubert* and Rule 702. *See Moore*, 547 F. App'x at 515, citing Fed. R. Evid. 702(b).

Accordingly, Cockburn should not be permitted to offer testimony from Dr. Waguespack regarding future lumbar treatment, particularly if she intends to change her opinions after the deadline for Rule 26(a)(2)(C) disclosures to suggest that Cockburn's lumbar conditions were somehow caused by the accident or that future lumbar treatment is somehow indicated.

**D. Dr. Waguespack's Testimony Will Not Assist the Trier of Fact.**

Finally, Dr. Waguespack's testimony is inadmissible as it will not assist the trier of fact. Due to her qualifications, her failure to have complete records, her own admissions as to causation, and her failure to consider other causes and aggravating factors, Dr. Waguespack's testimony cannot possibly aid the trier of fact in determining medical causation and necessity of treatment. The proffered expert testimony is required to be sufficiently tied to the facts of the case to aid the jury in resolving a factual dispute. *Daubert*, 509 at 591, 113 S. Ct. at 2795-2796. Based on the foregoing, Dr. Waguespack's testimony must be excluded as a matter of law.

Respectfully submitted:

*/s/ Kelly T. Scalise*

Brett D. Wise, T.A. (Bar #24711)
Kelly T. Scalise (Bar #27110)
Lance C. Bullock (Bar #38519)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

***Attorneys for Buffalo Marine Service, Inc.***

and

*/s/ Robert M. Schmidt*

Thomas R. Temple, Jr., T.A. (#26130)
Thomas.Temple@bswllp.com
Alexa Candelora (#39134)
Robert M. Schmidt (#37934)
Robert.Schmidt@bswllp.com
Alexa.Candelora@bswllp.com
**BREAZEALE, SACHSE & WILSON, L.L.P.**
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: (225) 387-4000
Facsimile: (225) 381-8029

***Counsel for Apex Oil Company, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF System which will provide notice to all counsel of record.

*/s/ Kelly T. Scalise*