**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CLINE COCKBURN** | * | **CIVIL ACTION NO.: 2:22-cv-02058** |
| | * | |
| **VERSUS** | * | **JUDGE: BARRY W. ASHE** |
| | * | |
| **APEX OIL COMPANY, INC, M/V SAN ROBERTO and BUFFALO MARINE SERVICE, INC.** | * * * | **MAGISTRATE JUDGE: KAREN WELLS ROBY** |
| | * * | |

*****************************************************************************

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE TO EXCLUDE THE TESTIMONY OF JORDAN FRANKEL (REC. DOC. 141) AND DR. ALEXIS WAGUESPACK (REC. DOC. 142)**

**MAY IT PLEASE THE COURT:**

Defendants' motions are all thunder and no rain, loud in accusation, heavy with rhetoric, but empty of the evidence needed to support their claims. They rumble about supposed delays in treatment or complaints of pain, undisclosed opinions, and unreliable methodology, yet the actual medical records and sworn expert testimony tell a completely different story, one that dismantles the Defendants' narrative and leaves their arguments with no factual or legal footing on which to stand.

## I. Introduction

As an initial matter, the Scheduling Order entered on October 25, 2023 set a clear and unambiguous deadline of September 19, 2024 for the filing of motions in limine directed at the admissibility of expert testimony.[1] Defendants ignored that deadline. They now attempt to sidestep it without offering any legitimate basis, let alone the "good cause" required under Fed. R. Civ. P. 16(b)(4), for the Court to consider these untimely motions. Defendants had ample time, nearly

[1] October 25, 2023 Scheduling Order, Rec. Doc. 51.

eleven months from the date of the Scheduling Order, to raise these challenges. Instead, they waited until well after the Court's deadline. Because these *Daubert* motions were filed in clear violation of the Court's Scheduling Order and without any showing of good cause, they are procedurally barred. The Court should deny them outright on timeliness grounds, without reaching the merits.

Defendants' motions to exclude the testimony of treating spine surgeon Dr. Alexis Waguespack and life care planner Jordan Frankel rest on two flawed premises: (1) that Dr. Waguespack's opinions regarding causation, necessity, and future medical care are unreliable under *Daubert* and were not timely disclosed under Rule 26; and (2) that Mr. Frankel's life care plan is inadmissible because it relies on Dr. Waguespack's opinions.

The record belies both premises. Dr. Waguespack is a board-certified spine surgeon who personally examined, treated, and operated on Mr. Cockburn. Her opinions are based on clinical examination, imaging studies, and direct surgical observation, not speculation. Moreover, her recommendations for both the posterior C3–C6 fusion and the adjacent-level C6–C7 fusion were timely disclosed in a signed summary dated July 11, 2024, deposition testimony and incorporated into Plaintiff's July 22, 2024 Rule 26(a)(2)(C) expert disclosures, all of which were timely disclosed according to the Court's October 25, 2023 scheduling order.

Mr. Frankel's life care plan appropriately incorporates these treating physician opinions, consistent with the standard methodology for certified life care planners and Fed. R. Evid. 703. Excluding either expert would be inconsistent with Rule 26, *Daubert*, and Fifth Circuit precedent.

## II. Factual Background and Procedural History

### A. Dr. Waguespack's Treatment and Opinions

Dr. Alexis Waguespack is a board certified,[2] orthopedic spine surgeon who attended medical school at LSU School of Medicine, did her residency at LSU and completed a fellowship in spine surgery at the San Francisco Spine Institute in California.[3] She has been performing orthopedic spinal surgery since 1998.

Following Mr. Cockburn's extensive physical therapy treatment at Brignac Physical Therapy for complaints of neck, back and knee pain, Dr. Waguespack began treating Mr. Cockburn on April 4, 2022 at which time cervical and lumbar MRIs were ordered to better evaluate Mr. Cockburn's condition and anti-inflammatory medication was prescribed.[4] Following an April 12, 2022 MRI, Dr. Waguespack diagnosed Mr. Cockburn with cervical disc herniations at C34, C45 and C56 on May 9, 2022 and discussed cervical injections and recommended continued physical therapy for cervical and lumbar spine injuries.[5] Mr. Cockburn had follow up visits with Dr. Waguespack on July 25, 2022, September 12, 2022, October 25, 2022 and January 24, 2023 at which time an injection of Toradol was administered for pain and medications were refilled while waiting for approval of payment for additional cervical injections from the longshore workers compensation adjuster.[6] Mr. Cockburn had follow up visits with Dr. Waguespack on April 25, 2023 and July 25, 2023 where cervical injections were still waiting approval from the longshore workers compensation adjuster.[7]

---

[2] Exhibit 1 – American Board of Orthopaedic Surgery Board Certification.
[3] Exhibit 2 – Dr. Waguespack's July 15, 2024 deposition, pg. 22: 22-25, pg. 23: 1-16.
[4] Exhibit 3 – Dr. Waguespack's medical records at 3.084.
[5] *Id.* at 3.081.
[6] *Id.* at 3.062 – 3.074.
[7] *Id.* at 3.054 – 3.062.

A breaking point came at the August 22, 2023 follow up visit with Dr. Waguespack where she noted:[8]

> **Discussion Notes**
> Pt with disc herniation at c45,56 now with progressive neurologic weakness and evidence of cord compression with gait disturbance consistent with myelopathy. Pt no a candidate for further tx discuss urgent decompression for risk of irreversible neurologic sequalae. Will submit for scheduleing and update stat MRI evlaute condition of cord preoperatively Pt needs to be off ozempic one week before sx

After conservative measures failed, Mr. Cockburn's condition progressed to myelopathy and the need for urgent decompression for risk of irreversible neurologic sequalae.[9] On September 25, 2023 Dr. Waguespack recommended a three level anterior cervical discectomy and fusion at C3-4, C4-5 and C5-6.[10] Following a pre-op visit with Dr. Waguespack on October 24, 2023,[11] Dr. Waguespack performed a three-level anterior cervical fusion at C3–C6 on October 27, 2023.[12]

From her first deposition on July 15, 2024, Dr. Waguespack unequivocally linked Mr. Cockburn's cervical pathology and surgeries to the incident:[13]

> Q Okay. So, in your opinion, Dr. Waguespack, more likely than not, are the cervical herniations in his steck that -- neck that you had to operate on caused by the July 5th, 2021, incident?
>
> A Yes.

Defendants' own hand-picked medical examiner, Dr. Everett Robert, conceded that the incident in question was fully capable of causing both a severe neck injury and a severe lumbar injury:[14]

---

[8] Exhibit 3 – Dr. Waguespack medical records at 3.054
[9] *Id.*
[10] *Id.* at 3.051.
[11] *Id.* at 3.045 – 3.048.
[12] Exhibit 4 – October 27, 2023 Anterior Cervical Fusion Operative Report.
[13] Exhibit 2 – Dr. Waguespack's July 15, 2024 deposition, pg. 84: 12-16.
[14] Exhibit 5 – Dr. Everett Robert's June 6, 2025 deposition, pg. 10: 10-14, 18-22.

Q. You would agree with me, sir, that falling on a gangway six to seven feet and landing upright can cause a severe neck injury?
A. Yes.

Q. You would agree with me, sir, that falling on a gangway six to seven feet and landing upright can cause a severe lumbar spine injury?
A. Yes.

After conceding that the accident was fully capable of causing the kind of severe neck and lumbar injuries Mr. Cockburn sustained, the defense medical examiner went further, abandoning his prior report and admitting under oath that the disc herniations in Mr. Cockburn's spine can, in fact, generate pain:[15]

Q. Okay. And you would agree with me that you're -- and -- and just to be clear you've -- you've now changed your opinion as it relates to whether these disc herniations in the cervical spine can be pain generators?
A. Correct.
Q. You do believe these -- you do believe that it is possible for these -- the disc herniations in Cline Cockburn's cervical spine to generate pain?
A. Yes. Yes.

Dr. Robert further admitted that there is no evidence whatsoever that Mr. Cockburn's neck pain arose before, or was caused by anything other than, the gangway collapse:[16]

[15] *Id.*at pg. 21: 6-17.
[16] Exhibit 5 – Dr. Everett Robert's June 6, 2025 deposition, pg. 14: 2-9.

> Q. And to be clear, you've not been provided any documentation that would suggest his neck pain developed before the gangway collapsed; correct?
> A. Correct.
> Q. You've not been provided any documentation to suggest that his neck pain developed from anything other than the injuries he sustained during the gangway collapse; yes?
> A. Correct.

Moreover, Dr. Robert testified that Mr. Cockburn was not faking or exaggerating any of his symptoms:[17]

> Q. Based on that thorough examination, you didn't believe during your examination that he was faking his symptoms; did you?
> A. I didn't believe that he was faking his symptoms.
> Q. Okay. You didn't believe that he was exaggerating his symptoms?
> A. I had no suspicion of that.

Mr. Cockburn continued physical therapy treatment and followed up with Dr. Waguespack on November 13, 2023, December 18, 2023, January 22, 2024, March 4, 2024, June 4, 2024, and on July 15, 2024 a discussion note indicates an X-ray revealed C5-6 subsidence consistent with pseudarthrosis delayed union.[18] That same day, July 15, 2024, Dr. Waguespack testified regarding

[17] *Id.* at pg. 29: 2-10.
[18] Exhibit 3 – Dr. Waguespack medical records at 3.028 – 3.045.

the need for future cervical treatment to include a posterior cervical fusion if subsidence or nonunion occurred:[19]

Q And do you believe at this point that he's going to require future medical treatment?

81

A Yeah. Today we're getting a CAT scan.

Q Okay.

A Because he looks like he has some subsidence at the 5-6 level.

So which I had talked to him before the -- about that, that, you know, three-level fusion, incidence of pseudarthrosis or subsidence or delayed union, and if he goes on to that, then it will be a posterior cervical fusion. If -- if he needs a posterior cervical fusion, that usually takes care of the problem. It's usually very effective. We can go ahead and see if we get away with a three-level cervical fusion without needing to do a posterior.

So now he's having -- he still has a lot of neck pain radiating to shoulder, difficulty with left lateral rotation, and it looks like he has subsidence at the C5-6 level, and it looks like there's motion at that level on flexion/extension, which kind of correlates with what he's saying.

So we're going to get a CAT scan. I talked to him about the surgery. It's not as bad as the anterior surgery. It's not as risky in terms of airway, because that's a huge concern.

[19] Exhibit 2 – Dr. Waguespack's July 15, 2024 deposition, pg. 80: 24-25, pg. 81: 1-23.

Follow up appointments were held on August 5, 2024, September 9, 2024, September 23, 2024 and on October 8, 2024 extensive discussion was held whereafter a posterior fusion at C3-4, C4-5 and C4-5 was scheduled.[20] That procedure was performed on October 18, 2024.[21]

On June 9, 2025, Dr. Waguespack testified very clearly as to her basis for the posterior fusion recommendation:[22]

> Q. And what was the basis of your surgical recommendation?
> A. What is the basis?
> Q. Yes. Why did you recommend surgery at that point?
> A. Because he was doing well and then he started to decline, because he had continued pain and he's having subsidence. So you can either leave it alone and let it continue to subside, where then it turns into a worser
>
> Page 37
>
> problem, or you can intervene at this point and hope you maintain what you have so far.

Post op appointments were held on November 4, 2024 and November 19, 2024 at which point Mr. Cockburn was experiencing drainage from the incision area that later was determined to be an infection.[23] On December 27, 2024 a procedure was performed for irrigation and debridement of the cervical spine for evacuation of seroma and culture.[24] Follow up appointments on January 13, 2025, February 24, 2025, March 24, 2025 all indicate that Mr. Cockburn's pain

[20] *Id.* at 3.015 – 3.026
[21] Exhibit 6 - October 18, 2024 Posterior Cervical Fusion Operative Report.
[22] Exhibit 7 – Dr. Waguespack June 9, 2025 deposition pg. 36: 16-25, pg. 37: 1-2.
[23] Exhibit 3 – Dr. Waguespack medical records at 3.10 – 3.015.
[24] Exhibit 8 – December 27, 2024 Infection Operative Report.

levels have decreased, he has improved range of motion and his overall quality of life has increased.[25] Mr. Cockburn continues to treat with Dr. Waguespack as of today.

The Court's October 25, 2023 scheduling order imposed a deadline of July 22, 2024 for Plaintiff's expert disclosures.[26] Plaintiff complied with that deadline.[27] On July 22, 2024 Defendants were served with "Plaintiff's Rule 26 Expert Disclosures," which set forth in explicit detail the opinions of Dr. Alexis Waguespack as it relates to Plaintiff's treatment, future recommendations and restrictions:[28]

7. Treatment Providers at SpineCare Medical Group, Inc., including but not limited to Alexis Waguespack, M.D.
Joelle Fabian, PA
3939 Houma Blvd.
Metairie, LA 70006
Dr. Waguespack diagnosed Plaintiff with left sided cervical disc herniation C3-4, C4-5, C5-6. On January 24, 2023, Plaintiff was administered an IM Toradol injection in office for cervical pain. On August 22, 2023, it was noted that Plaintiff had disc herniation C4-5, C5-6 now with progressive neurologic weakness and evidence of cord compression with gait disturbance consistent with myelopathy. A celestone injection was administered in office. On October 27, 2023, Dr. Waguespack performed an anterior cervical fusion C3-4, C4-5, C5-6 at Omega Hospital. Dr. Waguespack has provided the following recommendations:
    • As a result of the 7/05/21 accident, Mr. Cockburn needs to follow up with a Spine Surgeon every 3 months with cervical x-rays at each visit until he undergoes posterior cervical fusion at C3-C6 within the next 2 years.
    • As a result of the 7/05/21 accident, Mr. Cockburn needs the following medications, or a similar combination of medications, until he undergoes posterior cervical fusion at C3-C6 within the next 2 years:
        ○ Norco 7.5 mg, 3 times daily; and
        ○ Gabapentin 600 mg, 3 times daily.

[25] Exhibit 3 – Dr. Waguespack medical records at 3.001 – 3.010
[26] October 25, 2023 Scheduling Order, Rec. Doc. 51.
[27] Exhibit 9 – Email producing Plaintiff's expert disclosures and expert reports.
[28] Exhibit 10 – Plaintiff's Rule 26 Expert Disclosures at 10.005 – 10.006.

• As a result of the 7/05/21 accident, Mr. Cockburn needs posterior cervical fusion at C3-C6 within the next 2 years with the following pre- and post-operative treatment:

- Pre-operative cervical MRI;
- Post-operative follow up with a Spine Surgeon monthly for 6 months and then annually for the remainder of his lifetime with cervical x-rays at each visit;
- Post-operative medications including Tramadol 50 mg 4 times daily for 3 to 6 months, Valium 5 mg daily for 3 to 6 months, and Movantik 25 mg daily for 3 to 6 months; and
- Post-operative physical therapy 3 times per week for 4 weeks.

• As a result of the 7/05/21 accident, given Mr. Cockburn's age, he will more probable than not need an adjacent level cervical fusion at C6-C7 over his lifetime with the following pre- and post-operative treatment:

- Pre-operative cervical MRI;
- Post-operative follow up with a Spine Surgeon monthly for 6 months and then annually for the remainder of his lifetime with cervical x-rays at each visit;
- Post-operative medications including Tramadol 50 mg 4 times daily for 3 to 6 months, Valium 5 mg daily for 3 to 6 months, and Movantik 25 mg daily for 3 to 6 months; and
- Post-operative physical therapy 3 times per week for 4 weeks.

These disclosures included not only Dr. Waguespack's diagnosis and treatment history, but also her specific future care recommendations and permanent restrictions. Among those recommendations, stated plainly and without qualification, was that, as a result of the July 5, 2021 accident, Mr. Cockburn will more probable than not require an adjacent-level cervical fusion at C6–C7 over his lifetime, along with the associated pre- and post-operative treatment plan.[29]

Defendants' claim that this opinion was not disclosed is demonstrably false. The disclosure contains this recommendation verbatim, in the body of the Rule 26 statement, supported by the underlying treatment records and signed summary from July 11, 2024.[30] This was timely, sufficiently detailed, and fully compliant with both Rule 26(a)(2)(C) and the Court's Scheduling Order.

[29] Exhibit 10 – Plaintiff's Rule 26 Expert Disclosures at 10.005 – 10.006.
[30] Exhibit 11 – Dr. Alexis Waguespack signed treatment summary.

Any assertion to the contrary is not a dispute about disclosure, it is an attempt to ignore the plain language of the record that Defendants have had in their possession since the day of the deadline.[31]

During Dr. Waguespack's June 9, 2025 deposition, she very clearly outlined what the future held for Mr. Cockburn as it relates to his ongoing medical treatment and limitations:[32]

> You stated, as a result of the July 5th, 2021 accident, Mr. Cockburn needs a follow-up with a spine surgeon annually with cervical x-rays at each visit for the remainder of his lifetime. Do you still agree with that future recommendation?
>
> A. Yes. That's like I was saying. You know, you should follow up with someone at least to take an x-ray of your cervical spine, at least annually, to make sure the instrumentation isn't starting to fail.
>
> Q. You stated, as a result of the July 5th, 2021 accident, given Mr. Cockburn's age, he will more probable than not need an adjacent level cervical fusion at C6-7 within the next five to seven years. Do you still agree with

[31] Exhibit 9 – Expert disclosure email sent July 22, 2024. Please note a mistake in the body of the email claims what is being produced is "Plaintiff's Initial Disclosures, as well as our expert reports in this matter." This was an error in the email as the attachment clearly demonstrates expert disclosures being produced.
[32] Exhibit 7 – Dr. Waguespack June 9, 2025 deposition pg.71: 10-25, 72: 1-25, 73: 11-25, 74: 1-7.

that recommendation?

A. Yes.

Q. You stated that he's going to need the following pre- and postoperative treatment: Pre-operative cervical MRI. You agree with that?

A. Yes.

Q. Postoperative follow-up with a spine surgeon for six months and then annually for the remainder of his lifetime and cervical x-rays after each visit; you agree with that?

A. Correct.

Q. Postoperative medications, including Tramadol, 50 milligrams four times daily, for three to six months; Valium, five milligrams daily, three to six months; and Movantik, 25 milligrams daily for three to six months; do you agree with that?

A. Yeah.

Q. You stated postoperative physical therapy three times per week for four weeks. I believe you just testified it would be about six weeks. So maybe it's four to six weeks; do you agree with that more likely than not?

A. That's correct.

Q. As it relates to his restrictions, you reported that Mr. Cockburn is currently at a no work status. That was when you spoke to Jordan Frankel. He's still at a no work status as of today, yes?
A. That's correct.
Q. And he will remain at a no work status until he reaches one year post posterior fusion, right?
A. Correct.
Q. So that's one year from the date that he had his second cervical fusion?
A. Correct.
Q. And then you stated he will be permanently restricted to no lifting greater

Page 74

than ten pounds. Do you still agree with that?
A. Yes.
Q. You stated earlier that you agree with no overhead activity and occasional twisting and bending. You agree with that, obviously?
A. Yes.

The actual medical records and testimony tell a story that is starkly at odds with the defense's version in its motion in limine. The motion's narrative is not only unsupported, but also demonstrably false. Notably, the motion cites no actual medical records for its portrayal of events, a glaring omission that is telling in itself.

Contrary to the defense's insinuation of some "delay" in Mr. Cockburn's reporting of neck pain, the contemporaneous documentation proves otherwise. The accident report dated July 6, 2021, prepared by Mr. Cockburn's employer, AmSpec, explicitly records that he was complaining

of neck pain the day of the incident.[33] This is not a belated or after-the-fact complaint, it is immediate, documented, and corroborated by his employer's own report.

From there, the treatment timeline is clear and consistent: neck pain was reported immediately post-incident, noted in the employer's accident report, and followed by ongoing evaluation and care. The defense's omission of this fundamental fact, coupled with its reliance on argument rather than medical evidence, undermines the credibility of its position and exposes the motion as an attempt to reframe the record by ignoring it.

Simply put, there was no delay, and the defendants' failure to engage with the actual medical records is likely because those records flatly contradict their theory.

**B. Jordan Frankel's Life Care Plan**

Mr. Frankel, a certified life care planner, prepared a vocational analysis and initial life care plan dated July 22, 2024, and a supplemental plan dated May 1, 2025.[34] His methodology followed the accepted standards in his field. He first performed a vocational analysis informed by his education, training, and professional experience. He then relied on multiple, independent sources of information, including direct communications with Mr. Cockburn's treating physicians, the physicians' signed medical summaries, sworn deposition testimony, and complete sets of medical records, to determine the nature and scope of medically necessary future care. Using this foundation, he projected the associated costs in a manner consistent with recognized life care planning practices. Federal Rule of Evidence 703 expressly authorizes experts to base their opinions on facts or data "reasonably relied upon by experts in the particular field," which is precisely what Mr. Frankel did here.

---

[33] Exhibit 12 – AmSpec Incident Report.

[34] Exhibit 13 – Jordan Frankel Reports.

## III. Law and Argument

### A. Federal Rule of Evidence 702

Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified ... by knowledge, skill, experience, training, or education may testify" if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data;(c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[35]

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to assure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

The Court's gatekeeping responsibility involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid. *Daubert*, 509 U.S. at 593. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *Id.* at 590. Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case, and whether it will thereby assist the trier of fact to understand the evidence. In other words, it must determine whether the evidence is relevant. *Id.* at 591.

---

[35] Fed. R. Evid. 702.

The Court's role as a gatekeeper does not replace the traditional adversary system. As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight," rather than the admissibility, of that opinion. *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

**B. Dr. Waguespack is Eminently Qualified to Testify as an Expert and Her Opinions Are Admissible Under *Daubert***

**1. Dr. Waguespack is Board Certified and She Was Candid in Her Depositions**

Defendants' argument that Dr. Waguespack "lacks expertise" because of a temporary lapse in board certification is legally and factually meritless. The law is clear: Board certification is not required for a physician to qualify as expert.

"[T]he heart of *Daubert* is relevance and reliability. *Phillips v. General Motors Corp.*, 2000 WL 1285380 at *4 (E.D. La. Sept. 12, 2000). As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact, rather than for the court in its gate-keeping capacity." *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 (5th Cir.1999)(citing *Daubert* 509 U.S. at 596, 113 S.Ct. at 2798). Since 1998, Dr. Waguespack has been performing orthopedic spine surgery, she is currently board certified,[36] she graduated from LSU School of Medicine, did her residency at LSU, completed a fellowship in spine surgery at the San Francisco Spine Institute of California and has a valid license to practice medicine.

[36] Exhibit 1 – American Board of Orthopaedic Surgery Board Certification.

The [presence] or absence of board certification…is not controlling. *Phillips v. General Motors Corp.*, 2000 WL 1285380 at *4 (E.D. La. Sept. 12, 2000). ("The 'emphasis on qualifications over reliability of the expert testimony reflect[s] a pre-*Daubert* sensibility." (quoting *Watkins,* 121 F.3d at 992)). *See also United States v. Crosby,* 713 F.2d 1066, 1076 (5th Cir.1983)(noting district court had qualified a doctor without board certification as an expert); *Landry v. Offshore Logistics, Inc.,* 544 F.2d 757, 759 (5th Cir.1977)(allowing doctor who was board qualified, but not board certified to testify as an expert); *In re Ingram Barge Co.,* 187 F.R.D. 262, 264 (M.D.La.1999)(same).

Dr. Waguespack is currently board certified, was board certified at the time she performed all of Mr. Cockburn's surgeries and has the proper experience and credentials to easily qualify as an expert in orthopedic spine surgery:

- **Medical Degree & Licensure** – Dr. Waguespack is a licensed physician in good standing, authorized to practice medicine in Louisiana, with no suspensions or revocations.

- **Specialized Training** – She completed an orthopedic surgery residency and fellowship training in spine surgery.

- **Extensive Clinical Experience** – She has more than 25 years of experience as an orthopedic spine surgeon, treating thousands of patients with spinal injuries and conditions.

- **Direct, Hands-On Treatment of Plaintiff** – She personally evaluated Mr. Cockburn, reviewed his imaging, diagnosed his conditions, performed two complex cervical spine surgeries, and followed him through postoperative care.

- **Board Certification Status** – While there was a temporary lapse in board certification between January 2021 and July 2023, she is currently board certified and was board certified at the time she performed all of Mr. Cockburn's surgeries.

A treating physician is generally qualified to testify about a patient's diagnosis, treatment, and prognosis, including the future course of treatment, so long as the testimony is based on personal knowledge and the doctor's history, treatment and examination of the patient. *See Ladat v. Rayner* 2022 WL 1442982, at *3 (E.D. La. May 4, 2022) citing *Schlueter v. Ingram Barge Co.*,

2019 WL 5683371, at *4 (M.D. Tenn. Nov. 1, 2019). Dr. Waguespack personally examined and treated Mr. Cockburn, reviewed imaging, and performed two surgeries and an irrigation and debridement procedure on his cervical spine. This satisfies Fed. R. Evid. 702's requirements of qualification, reliability, and relevance.

Defendants' accusation that Dr. Waguespack showed a "lack of candor" in her deposition testimony about her board certification mischaracterizes both her statements and the governing American Board of Orthopaedic Surgery rules. The American Board of Orthopaedic Surgery ("ABOS") makes a clear distinction between:

a. **Lapse (Certification Expiration/Loss for Non-Disciplinary Reasons)** – The ABOS Rules and Procedures for Maintenance of Certification explains that a lapse in board certification or a loss of certification for non-disciplinary reasons simply requires the diplomate to take and pass an oral examination to regain certification. This can occur, for example, from failing to timely complete CME/SAE requirements or other administrative deadlines. It is not disciplinary in nature.[37]

b. **Revocation (Disciplinary Action for Cause)** – The ABOS "Certificate Revocation" provisions address revocation for cause, such as misconduct, breach of ABOS terms, or failure to maintain state licensure. This is a fundamentally different category from a non-disciplinary lapse.[38]

In both her July 15, 2024 and June 9, 2025 depositions, Dr. Waguespack truthfully answered that her certifications had never been "suspended or revoked," because they had not. A temporary lapse for non-disciplinary, administrative reasons is neither a "suspension" nor a "revocation" under ABOS rules. If defense counsel's questions had been precise, distinguishing between suspension, revocation, and lapse, there would have been no confusion. The ABOS's own definitions confirm that the defense's premise conflates unrelated concepts, wrongly suggesting disciplinary action where none occurred. In short, Dr. Waguespack's testimony was accurate and candid within the plain meaning of the questions asked. The insinuation that she sought to conceal

[37] Exhibit 14 – ABOS Rules and Procedures for Maintenance of Certification at 14.002: B.
[38] *Id.* at 14.003: E.

a temporary, non-disciplinary lapse is unfounded and contradicted by the ABOS's own published rules.

In sum, Defendants' attack on Dr. Waguespack's qualifications is an effort to distract from her extensive training, decades of specialized surgical experience, and direct, hands-on treatment of the Plaintiff. The law does not require, and has never required, perfect or uninterrupted board certification to testify as a medical expert. It requires relevant knowledge, skill, experience, training, or education, all of which Dr. Waguespack plainly possesses in abundance. The ABOS's own published rules confirm that her brief, non-disciplinary lapse was an administrative matter wholly distinct from any suspension or revocation, and it has no bearing on her competency or candor. Any attempt to conflate these concepts misleads the Court and misstates the governing standards under *Daubert* and Rule 702. Dr. Waguespack is fully qualified to offer expert opinions in this matter, and any dispute as to the weight of those opinions is an issue for the jury, not a basis for exclusion.

**2. Prior Unadjudicated Malpractice Suits are Irrelevant**

Defendants, again, attack Dr. Waguespack as being less than honest in her deposition, but the record tells a different story. Dr. Waguespack openly acknowledged that she had malpractice suits brought against her in the past:[39]

```
Q.     And have you ever had malpractice
suits brought against you?
A.     Malpractice suits brought against --
well, I think that I have had some, because when
they go to a malpractice, it goes to the board.
```

[39] Exhibit 7 – Dr. Waguespack June 9, 2025 deposition pg. 15: 21-25, pg. 16: 1-2.

```
                                                  Page 16
And whenever a patient does a malpractice, I'm
told it's a suit.
```

Her testimony on this point was direct, transparent, and entirely consistent with the facts, flatly contradicting Defendants' insinuations to the contrary. Regardless, such evidence is irrelevant under Federal Rules of Evidence 401 and 402. Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[40] Rule 402 provides that "[a]ll relevant evidence is admissible ..."[41] There has been no showing that any prior claims or records relating to Dr. Waguespack bear on the quality or credibility of her treatment of Plaintiff in this case. As courts have held, evidence of prior malpractice or credentialing issues is not probative of whether a physician met the standard of care in a specific instance.[42]

Moreover, even if marginally relevant, the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, misleading the jury, and wasting time, warranting exclusion under Rule 403.[43] This is particularly true where, as here, no actual findings of malpractice exist, only vague and unsubstantiated references to other cases and/or other credentialing records. The defense has not produced any records regarding claims of malpractice, or deficiencies in credentialing.

---

[40] Fed. R. Evid. 401.
[41] Fed. R. Evid. 402.
[42] *Bair v. Callahan*, 775 F. Supp. 2d 1163 (D.S.D. 2011); *Upky v. Lindsey*, No. 1:15-cv-486, 2015 WL 3862944 (D.N.M. June 3, 2015).
[43] Fed. R. Evid. 403.

Furthermore, any such evidence would be inadmissible character evidence under Rule 404(b), as it improperly invites the jury to conclude that Dr. Waguespack acted negligently in this case simply because she may have been accused of malpractice previously or had some issue with her board certification credentials.[44] In civil matters, Rule 404(b) precludes the introduction of evidence of other acts "to prove the character of a person in order to show that he acted in conformity therewith."[45] Rule 404(b) allows the admission of other acts for other purposes, such as proof of motive, opportunity, intent, or knowledge. In order to be admitted, the Court must first determine that the act is relevant to an issue other than character.[46] Pursuant to the second prong of *Beechum*, "the incremental probative value of the evidence [must not be] substantially outweighed by the danger of unfair prejudice."[47]

Here, as in *Kadlec*, Defendants are attempting to introduce evidence not for any legitimate Rule 404(b) purpose, but to suggest that because Dr. Waguespack has previously faced malpractice allegations, she is more likely to have been negligent in her treatment of Mr. Cockburn. This is precisely the type of improper character-based reasoning Rule 404(b) forbids.

Moreover, the Defendants have failed to articulate any permissible non-character purpose for introducing these past allegations. There is no indication that the alleged past complaints are probative of any relevant issue in this case, such as intent, knowledge, or motive. Instead, the implication is that these past events reflect a general propensity toward professional negligence.

---

[44] *Kadlec Medical Center v. Lakeview Anesthesia Associates*, No. 04-0997, 2006 WL 8446254, at *2–3 (E.D. La. Mar. 6, 2006) (Africk, J.) (excluding statement of deficiencies by a licensing authority as irrelevant and inadmissible under Rule 404(b)).

[45] Fed. R. Evid. 404(b); *see Dial v. Travelers Indem. Co.*, 780 F.2d 520, 523 (5th Cir. 1986).

[46] *See United States v. Beechum*, 582 F.2d 898, 911-12 (5th Cir. 1987) (setting forth test for admission of extrinsic evidence); *United States v. Infante*, 404 F.3d 376, 388 (5th Cir. 2005) (reiterating *Beechum*).

[47] *United States v. Peters,* 283 F.3d 300, 312 (5th Cir. 2002).

Such use of prior acts mirrors the strategy rejected in *Kadlec*, where the defendants attempted to show prior regulatory deficiencies to imply negligence in a later, unrelated patient incident.[48]

In short, Defendants' attempt to inject vague, unsubstantiated references to unrelated malpractice allegations or credentialing issues serves no legitimate evidentiary purpose. It is a transparent effort to inflame the jury and smear a highly qualified treating physician through improper propensity evidence. The Federal Rules of Evidence are clear, Rules 401 and 402 require relevance, Rule 403 prohibits unduly prejudicial and misleading material, and Rule 404(b) bars exactly the kind of "once negligent, always negligent" reasoning Defendants seek to employ. Without any proof that these unrelated allegations bear on the care Dr. Waguespack provided to Mr. Cockburn, their admission would do nothing but distract from the actual medical facts at issue. The Court should categorically exclude such evidence and reject Defendants repeated, baseless insinuations about Dr. Waguespack's honesty or competence in this case.

**C. Detailed Rebuttal to Defendants' Reliability and Disclosure Arguments**

**1. Causation Opinion was Based on Objective Findings, Not Solely Self-Reporting**

Defendants' assertion that Dr. Waguespack's causation opinion was "entirely based" on Plaintiff's self-reported history is contradicted by her documented treatment course and diagnostic findings.

- Within days of her initial April 2022 evaluation, she ordered cervical and lumbar MRIs.[49] The April 12, 2022 MRI revealed multilevel cervical disc herniations at C3–4, C4–5, and C5–6,[50] findings that are objective and not dependent on patient narrative.

---

[48] *Kadlec Medical Center v. Lakeview Anesthesia Associates*, No. 04-0997, 2006 WL 8446254, at *2–3 (E.D. La. Mar. 6, 2006) (Africk, J.) (excluding statement of deficiencies by a licensing authority as irrelevant and inadmissible under Rule 404(b)).
[49] Exhibit 3 – Dr. Waguespack's medical records.
[50] *Id.*

- Over multiple visits from May 2022 to October 2023, Dr. Waguespack tried conservative measures, medications, physical therapy and injections, before recommending surgery.[51]
- By October 2023, objective progression to cervical myelopathy was documented, prompting urgent decompression to avoid irreversible neurologic injury.[52]
- This sequence aligns with accepted orthopedic and neurosurgical standards and defeats the suggestion that she "assumed" causation based on subjective reports alone.

**2. Spondylosis Findings Do Not Negate Traumatic Aggravation**

Defense highlights the presence of "age-related" spondylosis as though it is mutually exclusive with traumatic injury. It is not.

- Dr. Waguespack's surgical findings documented both degenerative changes and acute pathology, herniated discs with cord compression, requiring surgical decompression.[53]
- Even Dr. Robert, the defense medical examiner, conceded that the gangway incident could cause a severe cervical and lumbar injury and that Mr. Cockburn's disc herniations were a valid pain generator.[54]
- Even if there were truly the presence of preexisting spondylosis, that alone does not sever causation when trauma accelerates or aggravates the condition.

**3. Alleged "Alternative Causes" are Unsupported and Not Medically Linked**

Defendants list various post-accident events, laying concrete, lifting equipment, minor falls, but point to no diagnostic imaging or medical record linking them to the surgical pathology treated by Dr. Waguespack.

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] Exhibit 5 – Dr. Everett Robert's June 6, 2025 deposition, pg. 10: 10-14, pg. 21: 6-17.

- These events were not contemporaneous with symptom onset, which was immediate and documented in the July 6, 2021 employer accident report.[55]
- No doctor, not even Dr. Robert, identified these events as the cause of Mr. Cockburn's cervical pathology or surgeries he underwent.
- Under Rule 702, speculation about unrelated activities is not a valid basis to exclude an otherwise reliable medical opinion.

**4. Pseudoarthrosis and Second Surgery Remain Medically Linked to the Accident**

Defendants argue that the second surgery was "unrelated" because pseudoarthrosis can occur for various reasons.

- That pseudoarthrosis is a known complication of multi-level fusion does not mean it is unrelated to the original injury; the fusion was necessitated by accident-related cervical pathology.
- Both the first and second cervical fusion surgeries stem directly from the July 5, 2021 accident. But for the accident, there would have been no traumatic cervical injury necessitating the initial multi-level fusion, and without that first surgery, there would have been no development of pseudoarthrosis requiring the second procedure.
- The medical chain is straightforward: the accident caused the cervical pathology, the cervical pathology required fusion, and the fusion's complication necessitated further surgery. Each link in that chain flows from the initial injury event.

[55] Exhibit 12 – AmSpec Incident Report.

**5. Dr. Waguespack's Opinion on Future C6–C7 Fusion is Reliable and was Timely Disclosed**

Rule 26(a)(2)(C) requires disclosure of "the subject matter" and "a summary of the facts and opinions." The signed July 2024 summary and the July 22, 2024 disclosure explicitly set out the C6–C7 fusion recommendation.[56] The defense's reliance on *Gilmore v. WWL-TV*, 2002 WL 31819135 (E.D. La. Dec. 12, 2002), fails because in *Gilmore* the opinion was wholly absent from any pretrial disclosure. Here, Defendants received written, signed, and served statements a year before trial.

While there is little case law addressing the requirements of Rule 26(a)(2)(C), which was only added to Rule 26 in 2010, Judge Duval of this Court has explained that "courts 'must take care against requiring undue detail' in Rule 26(a)(2)(C) disclosures." *Rea v. Wisconsin Coach Lines, Inc.,* No. 12–1252, 2014 WL 4981803, at *5 (E.D.La. Oct. 3, 2014). The summary should simply contain an "'abstract, abridgement, or compendium' of the opinion and facts supporting the opinion." *Id.* at *5. The Fifth Circuit has further acknowledged that "[t]he basic purpose of Rule 26 is to prevent prejudice and surprise." *Joe Hand Promotions, Inc. v. Chios, Inc.,* 544 Fed. Appx. 444, 446 (5th Cir.2013) (internal quotations and citations omitted).

Plaintiff's disclosures easily meet the requirements of Rule 26(a)(2)(C), which mandates only that the disclosure identify "the subject matter" and provide "a summary of the facts and opinions" to be offered. The signed July 2024 summary and the July 22, 2024 Rule 26 disclosures did exactly that, explicitly setting forth Dr. Waguespack's recommendation for a future C6–C7 fusion and the supporting medical basis. This is precisely the type of "abstract, abridgement, or compendium" contemplated in *Rea v. Wisconsin Coach Lines, Inc.*, 2014 WL 4981803, at *5 (E.D.

[56] Exhibit 11 – Dr. Alexis Waguespack signed treatment summary & Exhibit 10 – Plaintiff's Rule 26 Expert Disclosures

La. Oct. 3, 2014), and far more than the minimal detail required to avoid prejudice or surprise under *Joe Hand Promotions, Inc. v. Chios, Inc.*, 544 F. App'x 444, 446 (5th Cir. 2013). Defendants' reliance on *Gilmore v. WWL-TV*, 2002 WL 31819135 (E.D. La. Dec. 12, 2002), is misplaced because, unlike in *Gilmore*, where the opinion was entirely absent from any pretrial disclosure, here Defendants received written, signed, and served statements containing the recommendation a full year before trial.

**6. Frankel's Opinions Are Admissible**

Because Dr. Waguespack's opinions are admissible and were timely disclosed, the foundation for Mr. Frankel's projections remains intact. Life care planners, like Mr. Frankel, routinely rely on treating physicians' recommendations when formulating cost projections for future medical care. This methodology is not only standard but expressly permitted under Fed. R. Evid. 703.

In *Anders v. Hercules Offshore Services, LLC*, 311 F.R.D. 161, 164–65 (E.D. La. 2015), the court rejected an identical challenge, holding that a life care planner's reliance on a treating physician's recommendations, whether set forth directly in a Rule 26(a)(2)(C) disclosure or incorporated by reference from other expert materials, was proper, not hearsay, and not grounds for exclusion. The court emphasized that any disagreement with a physician's prognosis goes to weight, not admissibility, and is best addressed through cross-examination. Here, just as in *Anders*, the defense has had full access to Dr. Waguespack's opinions for over a year, and its own experts have not been hampered in responding. Frankel's life care plan projections, grounded in those medical opinions, are therefore admissible and should be evaluated by the jury, not excluded at the threshold.

## IV. Conclusion

Defendants' motions seek to exclude admissible, timely disclosed, and reliable testimony from a treating surgeon and a certified life care planner, opinions grounded in sound methodology, personal treatment, and industry-standard reliance. These are not speculative or surprise opinions; they are built on the very medical records and sworn testimony that Defendants choose to ignore. As shown above, the Defendants' motions thunder without delivering any evidentiary rain, full of rhetoric but empty of substance. At the end of the day, the only thing their arguments lack more than legal footing is factual support, and that is why they should be denied.

Respectfully submitted,

*/s/ Thomas W. Shlosman*

Thomas W. Shlosman (La. Bar No. 34086)
Shlosman Law Firm
4907 Magazine Street
New Orleans, Louisiana 70115
(504) 826-9427 Phone
(504) 324-0431 Fax
tom@shlosmanlaw.com